UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ANDREA RUTLEDGE,

    Plaintiff,

v.                   Case No. 8:22-cv-1782-VMC-SPF

VENGROFF WILLIAMS, INC.,

    Defendant.
_____/

**ORDER**

This matter comes before the Court pursuant to Defendant Vengroff Williams, Inc.'s Motion for Summary Judgment (Doc. # 25), filed on July 14, 2023, seeking summary judgment on all claims in this Americans with Disabilities Act (ADA) and Florida Civil Rights Act (FCRA) case. Plaintiff Andrea Rutledge responded on August 7, 2023. (Doc. # 28). Vengroff replied on August 21, 2023. (Doc. # 29). For the reasons that follow, the Motion is granted.

**I.**   **Background**

    **A.**   **Rutledge's Employment with Vengroff**

Rutledge was hired by Vengroff as an Accounts Receivable (A/R) Specialist in November of 2016. (Rutledge Depo. at 21:2-4). Pittsburgh Paint and Glass (PPG) was a client of Vengroff

1

to whom Rutledge was assigned to perform services. (Id. at 8:3-15; 26:13-14).

James Cooper was hired as a manager over the PPG team. (Cooper Depo. at 6:3-14). Cooper was Rutledge's direct supervisor for his "entire tenure." (Id. at 6:15-21). Cooper served in this position until Anne Faure took it over in November 2019. (Id. at 6:22-7:2; 20:21-22).

Cooper and Faure had some negative opinions about Rutledge's performance on the PPG team. According to Cooper, while Rutledge "was very knowledgeable on the software systems," "[a]s an employee, she was high maintenance." (Cooper Depo. at 8:12-16). He testified that Rutledge "complained a lot." (Id. at 8:20-21). According to Faure, Rutledge "was not easygoing." (Faure Depo. at 17:16). Faure also testified that Rutledge "was not really a team player." (Faure Depo. at 20:7-8).

Rutledge was the only credit analyst that Cooper worked with that required him to "jump on her calls . . . [to] resolve the matter" with customers. (Cooper Depo. at 10:5-21; 33:3-6). Cooper had to do this on at least "three occasions." (Id. at 10:5-18; 32:21-24). Cooper testified that Rutledge would "argu[e] with customers, argu[e] with team

members, not show[] up to work on time or as scheduled, not call[] in," and was "always . . . out." (<u>Id.</u> at 16:16–19).

Rutledge, for her part, disagrees with her former supervisors' characterization of her work performance and interactions with others. She emphasizes that she spent time training Cooper on use of relevant software. (Rutledge Depo. at 102:10-103:8). Rutledge testified that she was frequently praised for her good work on the PPG team and that her expertise and her willingness to train newer employees was well-known. (<u>Id.</u> at 108:11-23; 109:25-110:7; 259:3-21). And Stefan Pofahl, Vengroff's Vice President of Operations, testified that "early on" Rutledge was "a very experienced and skilled person, and very independent." (Pofahl Depo. at 25:3-10).

### B.   <u>Rutledge's Remote Work and Performance Issues</u>

Cooper would regularly permit employees to work from home, "but it wouldn't be week after week after week." (Cooper Depo at 36:23-37:6). The amount of time an employee would be permitted to work from home "was based on [Cooper's] decision." (<u>Id.</u> at 20:13-17). The length of time an employee could work from home was always decided "on a case-by-case basis" so there was no standard time limit. (Pofahl Depo. at

47:2-5; Wagner Depo. at 41:11-41:3). Cooper testified that he would only allow an employee to work from home if they were "knowledgeable" and "performing at the appropriate level." (Cooper Depo. at 19:1-12).

Rutledge began working from home in July of 2019. (Rutledge Depo. at 77:2-5; Cooper Depo. at 18:2-5). Rutledge was permitted to do so because of her "continued health issues." (Rutledge Depo. at 70:2-11; Cooper Depo. at 37:18-22). Specifically, Rutledge suffered a knee injury in July 2019 that limited her ability to walk. (Rutledge Depo. at 51:23-52:13; Faure Depo. at 52:1-12).

Rutledge never requested to work from home in July 2019. (Rutledge Depo. at 69:20-23). Rather, Rutledge simply told Cooper she "was not able to come back, and at that point is when [Cooper] asked [Rutledge] if [she] could work from home." (Id. at 69:20-23). Rutledge never discussed with Cooper "how long [she was] going to work from home." (Id. at 139:16-19). Cooper testified that "[t]he decision [for Rutledge] to work from home was totally [his]." (Cooper Depo. at 22:1-2). Pofahl testified that he would have been consulted on such teleworking decision from Cooper and would have signed off on it. (Pofahl Depo. at 43:22-44:4).

4

Vengroff provided Rutledge with a laptop so she could work from home. (Rutledge Depo. at 70:21-24, 78:5-7). Pursuant to Vengroff's Telecommuting Policy, Vengroff had the ability to terminate an employee's ability to work from home in their sole discretion upon 30 days' written notice. (Rutledge Depo. at Ex. 8 at 59-60; Cooper Depo. at 37:10-17). Vengroff's Telecommuting Policy states: "It is expected that employees who telecommute will devote all their effort to [Vengroff's] business during their workday." (Rutledge Depo. at Ex. 8 at 59). The Telecommuting Policy also provides: "If the telecommuting employee chooses not to return on the expected date, this will be considered a voluntary resignation." (Id.).

No one at Vengroff ever promised Rutledge that she could "work from home indefinitely for the rest of [her] life." (Id. at 139:20-22; 140:18-20; 141:6-11). In fact, Cooper perceived Rutledge's "delayed period working from home was definitely a stretch." (Cooper Depo. at 41:11-13). In Cooper's opinion, Vengroff was "very accommodating" with Rutledge. (Id. at 38:5-6). Specifically, "because of [Rutledge's] illness, Vengroff and [Cooper] . . . were flexible." (Id. at 41:24-25).

5

If Rutledge was not able to produce medical documentation saying that she still needed to work from home, Cooper testified he "absolutely" would have called her back into the office. (<u>Id.</u> at 41:14-42:1). While Lisa Wagner, Vengroff's Human Resources Manager, testified that Rutledge had to "keep in touch with Vengroff" about her medical need to work from home, Vengroff allowed Rutledge to telework between August and November 2019 without having submitted a doctor's note specifying a return date. (Wagner Depo. at 74:21-75:16). Still, Wagner emphasized that Rutledge would have had to provide during that time an "update to let [the supervisor] know what's happening" because Vengroff looks "for a return date, right, because [Vengroff does not] want an employee to be off forever without having documentation of it." (<u>Id.</u> at 75:17-22). Wagner testified that when she "asked [Rutledge] what accommodation she would need," Vengroff "didn't receive anything, aside from that [Rutledge] need[ed] to work from home." (<u>Id.</u> at 89:5-7).

Rutledge's doctor provided Rutledge with a note on July 22, 2019, which stated that Rutledge "has been under [his] care and is able to return to work or school on July 22nd, 2019." (Rutledge Depo. at 65:9-67:2, 67:15-68:3, 68:15-20,

Ex. 10). Nowhere in this doctor's note did it say that Rutledge was unable to return to work after July 22nd, 2019. (Id.). On July 25, 2019, Cooper provided Vengroff with the doctor's note from Rutledge. (Cooper Depo. at 21:10-21, Ex. 1).

On July 31, 2019, Rutledge had another appointment with the same doctor. (Rutledge Depo. at 71:17-72:10, Ex. 11). On this same date, Rutledge's doctor provided Rutledge with a note, stating that Rutledge "is unable to walk or ambulate to go to work but able to work at home six to eight . . . [h]ours a day." (Id. at 74:24-75:3; Ex. 11). Rutledge provided this note to Vengroff. (Id. at 76:18-21).

Rutledge never saw her doctor between July 31 and December 31, 2019. (Id. at 133:12-14). During 2019, Rutledge never provided another doctor's note indicating that she needed to remain working from home after December 31, 2019. (Id. at 132:17-133:11). On August 26, 2019, Wagner sent an email to Rutledge, asking for "an update on how much longer [she] will need to work from home." (Wagner Depo. at 59:22-60:7; Ex. 1). But there is no record of Rutledge ever responding to this email. (Id. at Ex. 1).

Faure became Rutledge's supervisor "in the beginning of November" 2019. (Faure Depo. at 56:6-10). Prior to this promotion, Faure had previously worked alongside Rutledge on the PPG team. (Id. at 17:7-9; 43:3-7).

While Rutledge was working from home, Vengroff received complaints about Rutledge from other employees. (Id. at 34:23-25). Specifically, when employees on the PPG team would work remotely, issues would occur when "a customer . . . wanted to make [a] payment," because the remote employee was not allowed to take payments while remote so "had to transfer the call" to another employee at Vengroff, which "doesn't look professional." (Id. at 25:8-26:7). Faure testified that when Rutledge "used to transfer the call, . . . she used to complain all the time because it was not fast enough for people to pick up the call to make the payment." (Id. at 26:11-14). The rest of the PPG team "was pretty annoyed by this behavior." (Id. at 26:19-24).

While Rutledge was working from home, Vengroff's PPG team "were all very concerned when they saw [Rutledge] was taking ten minutes to wrap up a call, because [they] had two minutes." (Faure Depo. at 41:2-6). Rutledge's coworkers were also "upset when [Rutledge] was showing up at 9:30 or 10:00

in the morning" as well. (Id. at 41:8–9). Faure felt that Rutledge's conduct "hurt[] the team." (Id. at 41:21–42:5).

Accordingly, Rutledge was "not involved in the team improvement." (Id. at 57:10–11). For example, Rutledge "was not using the same signature that [Faure] asked people to use" despite Faure "ask[ing] her many times to change her signature." (Id. at 57:12–14). Faure also noted that Rutledge would "not escalat[e] anything to [Faure]." (Id. at 60:17–61:8). Rutledge would also not "[carbon copy] [Faure] on any escalation, so [Faure] couldn't see anything that [Rutledge] was doing." (Id. at 60:22–61:1). "The manager was supposed to be [carbon copied] on every escalation done with PPG." (Id. at 61:3–4).

Faure testified that Rutledge also "was rude to [the second shift]." (Id. at 61:22–25; 62:17–22). Rutledge "was not communicating with anybody on the [PPG] team." (Id. at 64:22–65:2). According to Faure, Rutledge "used to do whatever she wanted to do, so it was difficult to manage." (Id. at 66:2–3).

Rutledge disagreed that she had performance issues or issues with her co-workers while working from home. She testified that her performance was good, she was polite to

and helped her co-workers, and that no one offered her any additional training or "offered [her] any opportunity of any remediation needed." (Rutledge Depo. at 115:24-116:5; 125:12-126:6; 127:22-128:1; 164:1-7). Rutledge never received any written disciplinary warning and was never placed on a performance improvement plan (PIP) before her termination, despite Vengroff's progressive discipline policy. (Faure Depo. at 42:6-17; Cooper Depo. at 11:20-12:23; Pofahl Depo. at 17:16-18:16; 20:1-6; Wagner Depo. 14:4-22). However, Vengroff's employee handbook specified that "[d]iscipline may take one of the following forms: verbal counseling, written counseling, probation, suspension, and/or termination," and that Vengroff "has no obligation to use any of the above disciplinary methods prior to discharging employees." (Rutledge Depo. at Ex. 7 at 23; Ex. 8 at 22).

Rutledge also highlights Wagner's testimony that an employee was only allowed to work from home if they were "in good standing," meaning "the client was happy with their work [and] they weren't causing problems with the other employees." (Wagner Depo. at 31:2-9). However, Wagner also testified that an employee would be required to be in good standing to work from home "unless it was medically

necessary," meaning that the good standing requirement did not apply to teleworking arrangements that were medically necessary. (Id. at 31:10-13).

On November 14, 2019, Wagner requested Rutledge to "have [her] doctor complete a new note with time frames and any accommodations that are required." (Id. at 65:5-11, Ex. 7). On November 21, 2019, Wagner followed up with Rutledge, again requesting "updated information from [her] doctor for [her] expected return date." (Id. at Ex. 7). As of November 21, 2019, Vengroff was "trying to ascertain when [her need to work from home] would be ending and what [Rutledge's] plans were." (Id. at 72:7-10). Specifically, Vengroff was "waiting on documentation from [Rutledge] to see what was happening with her." (Id. at 74:21-25). Vengroff was "not blanket[ly] allowing [Rutledge] to work from home forever." (Id. at 81:6-11). Vengroff has "not in the past accepted an open-ended" period for accommodation. (Id. at 80:11-15).

Rutledge responded to Wagner's November 21, 2019 email, indicating that she had "a follow up [appointment] with [her] doctor, but it won't be until after the Holiday." (Id. at 81:6-8, Ex. 7). Accordingly, Vengroff permitted Rutledge to

work from home from July 2019 until the end of December 2019. (Rutledge Depo. at 77:24–78:4; 120:25–121:2).

Faure gave Rutledge a performance evaluation on December 10, 2019. (Faure Depo. at 42:21–24; 55:12–19; Ex. 1). Faure gave Rutledge an overall final score of 1.7498. (Id. at 56:17–23, Ex. 1). This number rating placed Rutledge between the "Progressing" and "Not Progressing" categories. (Id.). Still, Faure testified that Rutledge "was doing her job but she was not progressing." (Id. at 57:3–18, 58:14–15).

### C.   More Requests for Documentation and Termination

"At some point after December 31st, 2019," Vengroff again "ask[ed] [Rutledge] when [she] was going to be able to return to work." (Rutledge Depo. at 174:9–13). On January 2, 2020, Faure sent Rutledge an email requesting that Rutledge provide a doctor's note relating to her physical therapy appointment or scan appointment held on December 31, 2019. (Id. at 180:18–20, Ex. 22). But Rutledge never provided as much to Vengroff. (Id. at 181:1–4). In fact, Rutledge did not actually attend a physical therapy or doctor's appointment on December 31, 2019. (Id. at 181:17–19). Rutledge testified that she drove to a doctor's appointment that day but did not see the doctor or get the scheduled scan. (Id. at 182:2–25).

Rather, in response to Faure's January 2 email asking for documentation of the December 31 appointment, Rutledge told Faure that she had "a follow up with my main doctor . . . next week . . . at which time I will be obtaining an updated and current note for my inability to ambulate for work at the office, and my continued necessary daily Physical Therapy and continued treatment and supervision of me." (Id. at 181:11–16, Ex. 22).

In response, on January 2, 2020, Wagner again asked Rutledge to provide additional documentation from a doctor. (Id. at 183:16–184:2, Ex. 22). As of this date, Rutledge understood that Vengroff was saying it needed additional information from Rutledge. (Id. at 183:19–184:2). On January 13, 2020, Rutledge provided another doctor's note, which stated, "[t]his patient has been under my care and is able to return to work or school on for [sic] 3 weeks." (Id. at 184:21–185:13, Ex. 19). This note stated that Rutledge had severe osteoarthritis in one knee and was being referred to an orthopedic surgeon for possible surgery. (Id. at Ex. 19). This was the last note Rutledge ever provided to Vengroff. (Id. at 192:8–11).

Vengroff's HR Manager Wagner understood this note to mean that Rutledge would need to work from home "for an additional three weeks." (Wagner Depo. at 89:15-19; Wagner Aff. at ¶ 6). Although Wagner found the wording of the note "very vague," Wagner also understood that this note meant Rutledge would be able to return to work on February 3, 2020. (Wagner Depo. at 89:15-19; Wagner Aff. at ¶ 7).

After January 13, 2020, Rutledge "didn't see [her] doctor again." (Rutledge Depo. at 192:3-7, 203:18-20, 204:2-6, 19-20, 206:3-5). She also "did not" provide Vengroff with another doctor's note indicating that she could not be in the office for "another three weeks." (Id. at 192:3-7). In fact, Rutledge did not "provide any additional medical directives to work from home after the January 13th doctor's note." (Id. at 224:15-18).

Additionally, Vengroff provided Rutledge FMLA paperwork "to cover her doctor's appointments for her," and "so [the time taken to attend appointments is] not used in the performance appraisals for attendance and issues like that." (Id. at 186:1-10; Wagner Depo. at 68:14-18; Ex. 3). The FMLA paperwork provided to Rutledge "ha[d] a fifteen-day period [for completion] written in it." (Wagner Depo. at 71:15-16).

14

Rutledge made the decision not to provide any physician with any FMLA paperwork. (Rutledge Depo. at 197:9–11; 212:9–12).

On January 24, 2020, Rutledge told Wagner that she was "being referred to an Orthopedic Surgeon." (Id. at 194:10–16, Ex. 24). But Rutledge never saw an orthopedic surgeon. (Id. at 199:4–8, 200:8–17, 203:15–17, 204:1). Then, on January 31, 2020, Rutledge told Wagner that she had "another follow[-]up and consultation with the doctor on [Monday] next week Feb[ruary] 3rd, and the referral visit to the Podiatrist on [Tuesday] Feb[ruary] 11th." (Id. at 202:17–203:4, Ex. 25).

But Rutledge did not attend a follow-up and consultation with any doctor on February 3, 2020. (Id. at 203:5–8, 204:11–20). Rutledge also did not see a podiatrist on February 11, 2020. (Id. at 205:10–12). She testified that she canceled these appointments. (Id. at 207:1–14).

On February 5, 2020, Wagner sent an email to Rutledge inquiring as to whether Rutledge was "able to get the paperwork for [her] accommodations that [she was] still needing and what [her] return to work date [would] be from [her] visit on February 3rd?" (Id. at 207:21–208:5, Ex. 25). Wanting to clear up any confusion as to the prior email, on February 17, 2020, Wagner sent yet another email to Rutledge

15

stating, "As o[f] today I have not received any additional paperwork. Going off the last paperwork received[,] your 3 week period will end Friday. Your plans are to return to work Monday on your normal schedule?" (Id. at 213:16–24, Ex. 25).

In response, Rutledge indicated that she was "[w]aiting on a referral to an orthopedic surgeon." (Id. at 214:22–24, Ex. 25). Wagner, meanwhile, explained to Rutledge that, "[she] need[ed] to let [Pofahl] [k]now to expect your return – from the note from the doctor that will be Monday, Correct?" (Id. at 215:20–25, Ex. 25). When Rutledge wrote in response that her condition had worsened and she was "not able to return [to] work," Wagner requested that, if Rutledge needed an extension of working from home, Rutledge should "have the doctor complete a new note that includes a new return to work date." (Id. at Ex. 25). Thus, as of February 17, 2020, Vengroff was expecting Rutledge to return to work on February 24, 2020. (Id. at 214:17–21, 215:20–216:1, Ex. 25; Wagner Aff. at ¶ 11). Nevertheless, Rutledge testified that it was never made clear to her that "if [she] didn't come back [she would] be fired." (Rutledge Depo. at 190:16-22).

On February 21, 2020, Wagner followed up with Rutledge again, after having received no response, asking for an update

on Rutledge's status. (Id. at 218:5–13, Ex. 25). On February 24, 2020, Wagner again followed up with Rutledge, stating that, "I was expecting you today, but I do not see that you have signed in." (Id. at 219:20–220:2, Ex. 25).

Rutledge, at the latest "knew that [she] had to be back at work on Wednesday, February 26th." (Id. at 221:10–12). When asked if she was coming back into the office, Rutledge told Vengroff that she still "could not come to work in the office . . . [a]s decided by [herself]" because she was "the one with the injury" and "[knew] [her] ability." (Rutledge Depo. at 192:16–20). As of February 27, 2020, at the very latest, Vengroff believed that Rutledge "no longer ha[d] medical directives to work from home." (Wagner Depo. Ex. 4; Wagner Aff. at ¶ 12).

Faure, Pofahl, and Kay Houston of Vengroff's HR Department made the decision to terminate Rutledge. (Rutledge Depo. at 239:7–11; Wagner Depo. at 93:20–21; Pofahl Depo. at 61:4–11). At this time, Faure recalled that Rutledge's "work was not . . . what it used to be." (Faure Depo. at 48:15–25). Faure testified that Vengroff's HR knew this a few days before Rutledge was terminated and they knew that Faure "wanted a resolution." (Id. at 48:1–25). Nevertheless, Rutledge points

17

out that Faure also called Rutledge's work "average" and testified that an employee rated as "not progressing" on a performance evaluation did not "have to be terminated." (Id. at 43:12-18, 58:4-8). Faure testified that, while she considered Rutledge's work "average," she "was hoping that at some point [Rutledge] would feel better and her work would be proof, but, yes, she was not improving." (Id. at 43:16-25).

Rutledge was terminated by Vengroff on March 3, 2020. (Rutledge Depo. at 225:4-8). As of that date, Rutledge had not returned to Vengroff's workplace. (Id. at 174:5-8, 207:18-20, 225:9-11, 219:8-10, 220:3-5, 225:9-11; Cooper Depo. at 38:13-19). Although Rutledge was told that her termination was for performance (Rutledge Depo. at 225:12-226:3), Rutledge was terminated due to her work performance and continued failures to provide Vengroff with the required paperwork to justify her continued teleworking. (Faure Depo. at 50:16-24, 68:5-12; Pofahl Depo. at 49:24-50:2).

D.    **Procedural History**

Rutledge initiated this action on August 5, 2022, asserting claims for disability discrimination under the Americans with Disabilities Act (ADA) and the Florida Civil Rights Act (FCRA). (Doc. # 1). In the complaint, Rutledge

proceeds under both a failure to accommodate theory and a disparate treatment theory. (Id. at 5). Vengroff filed its answer (Doc. # 10), and the case proceeded through discovery.

Now, Vengroff seeks summary judgment on all claims. (Doc. # 25). Rutledge has responded (Doc. # 28), and Vengroff has replied. (Doc. # 29). The Motion is ripe for review.

## II.   **Legal Standard**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute alone is not enough to defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude a grant of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (citing Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993)). A fact is material if it may affect the outcome of the suit under the governing law. Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir.

1997). The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1260 (11th Cir. 2004) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). "When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (quoting Celotex, 477 U.S. at 324).

If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to be true and all reasonable inferences must be drawn in the non-moving party's favor. Shotz v. City of Plantation, 344 F.3d 1161, 1164 (11th Cir. 2003). If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, the court should not grant summary judgment. Samples ex rel. Samples v. City of Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988). But, if the non-movant's

response consists of nothing "more than a repetition of his conclusional allegations," summary judgment is not only proper, but required. Morris v. Ross, 663 F.2d 1032, 1034 (11th Cir. 1981).

**III. Analysis**

In her complaint, Rutledge asserts claims for disability discrimination and failure to accommodate under the ADA (Count I) and disability discrimination and failure to accommodate under the FCRA (Count II). (Doc. # 1). "Given the parallel structure of the statutes, this Court analyzes state-law disability discrimination claims under the FCRA using the same framework as it does for claims made under the federal" ADA. D'Onofrio v. Costco Wholesale Corp., 964 F.3d 1014, 1021 (11th Cir. 2020).

To succeed on a discrimination claim, Rutledge must show that: "(1) [s]he is disabled; (2) [s]he was a qualified individual at the relevant time, meaning [s]he could perform the essential functions of the job in question with or without reasonable accommodations; and (3) [s]he was discriminated against [] because of [her] disability." Scott v. Shoe Show, Inc., 38 F. Supp. 3d 1343, 1359 (N.D. Ga. 2014) (citation omitted). Failure to accommodate a disabled employee is one

21

type of disability discrimination. <u>Lucas v. W.W. Grainger, Inc.</u>, 257 F.3d 1249, 1255 (11th Cir. 2001). Nevertheless, the Court will address the theories of failure to accommodate and disparate treatment disability discrimination separately for the sake of clarity.

### A.   <u>Failure to Accommodate</u>

"An employer unlawfully discriminates against a qualified individual with a disability when the employer fails to provide 'reasonable accommodations' for the disability — unless doing so would impose undue hardship on the employer." <u>Id.</u> (quoting <u>Davis v. Fla. Power & Light Co.</u>, 205 F.3d 1301, 1305 (11th Cir. 2000)). A qualified employee with a disability has the burden of establishing that reasonable and feasible accommodations were available that would have allowed the employee to perform the essential functions of the job. <u>Waddell v. Valley Forge Dental Associates, Inc.</u>, 276 F.3d 1275, 1280 (11th Cir. 2001). Once the employee makes this showing, the burden then shifts to the employer to present evidence of their inability to accommodate, either due to the unreasonableness of the request, or the undue hardship the accommodation would place

22

on the employer. Terrell v. USAir, 132 F.3d 621, 624 (11th Cir. 1998).

Still, "the duty to provide a reasonable accommodation is not triggered unless a specific demand for an accommodation has been made." Gaston v. Bellingrath Gardens & Home, Inc., 167 F.3d 1361, 1363 (11th Cir. 1999). "Where the employee fails to identify a reasonable accommodation, the employer has no affirmative duty to engage in an 'interactive process' or to show undue hardship." Spears v. Creel, 607 F. App'x 943, 948 (11th Cir. 2015). Additionally, an "employer is not required to accommodate an employee in any manner in which that employee desires." Terrell, 132 F.3d at 626 (citation omitted). "The plaintiff bears the burden of identifying an accommodation, and of demonstrating that the accommodation allows him to perform the job's essential functions." Lucas, 257 F.3d at 1255-56.

Here, Vengroff argues that it was permitted to request medical documentation to support the continued teleworking accommodation, that Rutledge's desired accommodation of indefinite telework was unreasonable, and, finally, that Rutledge never made a sufficiently specific request for accommodation. (Doc. # 25 at 18-21).

23

The Court agrees with Vengroff that it did not fail to accommodate Rutledge. Indeed, it is undisputed that Vengroff accommodated Rutledge by allowing her to work from home for approximately seven months considering her knee problem. And Vengroff, in determining what accommodation was reasonable, was permitted to request a doctor's note setting a return-to-work date. Here, where Rutledge's final doctor's note only stated that she needed a telework accommodation through February 3, 2020 (Rutledge Depo. at Ex. 19), Vengroff did not fail to accommodate Rutledge by recalling her to in-office work in late February 2020. (Id. at Ex. 25). Rutledge's telework accommodation had expired at that point and Vengroff accordingly expected her to return to the office. See Delotta v. S. Broward Hosp. Dist., No. 19-62905-CIV, 2022 WL 888425, at *8 (S.D. Fla. Feb. 25, 2022) (granting summary judgment on ADA and FCRA claims where the defendant employer "accommodated [plaintiff] formally and informally for years," "did not withdraw Plaintiff's work commute accommodation," but rather, "it expired").

Additionally, assuming that Rutledge's emails in February 2020 mentioning intended follow-up doctor's appointments or saying that she still was unable to work in

the office qualify as requests for accommodation, Rutledge did not request a reasonable accommodation. Again, an "employer is not required to accommodate an employee in any manner in which that employee desires." Terrell, 132 F.3d at 626 (citation omitted). Here, an accommodation to telework indefinitely, unsupported by medical documentation about the need to do so, was not a reasonable accommodation. See Okafor v. Infuserve Am., Inc., No. 8:21-cv-2007-JLB-MRM, 2023 WL 3563600, at *13 (M.D. Fla. Mar. 6, 2023) ("Even if Ms. Okafor's emails attaching Nurse Moreno's note recommending that Ms. Okafor work remotely did count as a specific demand for reasonable accommodation, Ms. Okafor has failed to demonstrate that indefinite remote work was in fact a reasonable accommodation."). Notably, Rutledge was not able to perform all essential duties of her job while teleworking; she was unable to process payments over the phone while working from home, which required her to transfer the phone call to a co-worker to process the payment. (Faure Depo. at 25:8–26:7); see Okafor, 2023 WL 3563600, at *13 ("[T]he Eleventh Circuit case law is clear that an indefinite pause on some aspect of a plaintiff's job as a result of a disability-related accommodation is unreasonable.");

25

Frazier-White v. Gee, 818 F.3d 1249, 1256 (11th Cir. 2016) ("Plaintiff did not suggest a time frame for when she would be able to resume her full-duty position, and she later admitted at the due process hearing that she did not know how much time she needed or whether any amount of time would be sufficient. As the district court correctly held, Plaintiff's request for an indefinite extension of light-duty status was unreasonable as a matter of law."). This caused conflict between Rutledge and other employees. (Faure Depo. at 26:11-24).

And, as far as Vengroff saw, Rutledge's doctor believed that Rutledge did not need to telework after February 3, 2020, despite Rutledge's later statements that she still needed to work from home. Vengroff informed Rutledge that she needed to provide a doctor's note with a specified return-to-office date to continue working from home after that. (Rutledge Depo. at Ex. 25). But Rutledge never did provide such note, let alone actually see a doctor to obtain such note.

Vengroff also provided Rutledge with another option by providing her FMLA paperwork she could have her doctor fill out to at least cover Rutledge's medical appointments (as Rutledge did not wish to take full FMLA leave). (Wagner Depo.

at Ex. 3). But Rutledge made the decision not to provide the FMLA paperwork to a physician. (Rutledge Depo. at 197:9-11; 212:9-12).

While Rutledge takes issue with Vengroff's not providing her its ADA certification form to address accommodations (Wagner Depo. at 66:16-67:25), there is no genuine dispute that the only accommodation Rutledge requested was to telework. (Id. at 67:3-11; Rutledge Depo. at Exs. 19 & 25). Vengroff understood teleworking as an accommodation for Rutledge's knee problem and accommodated her for several months until Rutledge failed to provide medical documentation supporting continuance of the accommodation. (Rutledge Depo. at Ex. 25; Wagner Depo. at 78:20-79:5, 81:21-82:3, 89:2-7, 90:25-91:6). Thus, summary judgment is granted on Rutledge's claims as to the failure to accommodate theory of discrimination.

### B.   Disability Discrimination

Again, to succeed on her discrimination claim, Rutledge must show that: "(1) [s]he is disabled; (2) [s]he was a qualified individual at the relevant time, meaning [s]he could perform the essential functions of the job in question with or without reasonable accommodations; and (3) [s]he was

27

discriminated against [] because of [her] disability." <u>Scott</u>, 38 F. Supp. 3d at 1359 (citation omitted).

"The burden-shifting analysis of Title VII employment discrimination claims" — as established by <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973) — "is applicable to ADA claims." <u>Earl v. Mervyns, Inc.</u>, 207 F.3d 1361, 1365 (11th Cir. 2000). "If the employee is able to establish his *prima facie* case, the burden shifts to the employer to come forward with a legitimate, nondiscriminatory reason" for the adverse action. <u>Alvarez v. Sch. Bd. of Broward Cnty.</u>, 208 F. Supp. 3d 1281, 1285 (S.D. Fla. 2016). At that point, the burden shifts back to the plaintiff on the issue of pretext.

Here, the Court will assume — without deciding — that Rutledge has established a prima facie case of disability discrimination. And, for its part, Vengroff has provided legitimate, non-discriminatory reasons for terminating Rutledge: "her poor work performance and failure to return to work without providing medical documentation to justify her continued absence from the workplace." (Doc. # 25 at 25). These justifications are supported by Rutledge's poor performance review in December 2019, and her failure to

provide a doctor's note after January 13, 2020, to support her need to continue working from home.

Thus, the burden shifts back to Rutledge to establish a genuine issue of material fact as to pretext. This she cannot do. "[T]o avoid summary judgment [the plaintiff] must introduce significantly probative evidence showing that the asserted reason is merely a pretext for discrimination." Clark v. Coats & Clark, Inc., 990 F.2d 1217, 1228 (11th Cir. 1993) (citation omitted). "A legitimate nondiscriminatory reason proffered by the employer is not a pretext for prohibited conduct unless it is shown that the reason was false and that the real reason was impermissible retaliation or discrimination." Worley v. City of Lilburn, 408 F. App'x 248, 251 (11th Cir. 2011) (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993)). "If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot merely recast the reason, but must meet it 'head on and rebut it.'" Id. (quoting Chapman v. AI Transp., 229 F.3d 1012, 1030 (11th Cir. 2000)). Thus, to show pretext, an employee must demonstrate "such weaknesses, implausibilities, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that

a reasonable factfinder could find them unworthy of
credence." <u>McCann v. Tillman</u>, 526 F.3d 1370, 1375 (11th Cir.
2008) (quoting <u>Cooper v. S. Co.</u>, 390 F.3d 695, 725 (11th Cir.
2004)). The Court cannot second guess the defendant's
business judgment or inquire as to whether its decision was
"prudent or fair." <u>Damon v. Fleming Supermarkets of Fla.,
Inc.</u>, 196 F.3d 1354, 1361 (11th Cir. 2003).

Here, Rutledge attempts to establish pretext by relying
on the temporal proximity between the January 13 doctor's
note and Rutledge's termination on March 3, 2020, as well as
her disagreement with Vengroff's assertions that Rutledge had
performance issues and failed to return to work once she
lacked medical documentation to continue teleworking. (Doc.
# 28 at 17-19).

First, "[c]lose temporal proximity is, standing alone,
generally insufficient to establish pretext." <u>Beale v.
Clearwater Compliance LLC</u>, No. 8:20-cv-2210-VMC-CPT, 2021 WL
7285355, at *5 (M.D. Fla. Dec. 17, 2021); <u>see also</u> <u>Hurlbert
v. St. Mary's Health Care Sys., Inc.</u>, 439 F.3d 1286, 1298
(11th Cir. 2006) ("The close temporal proximity between
Hurlbert's request for leave and his termination — no more
than two weeks, under the broadest reading of the facts — is

evidence of pretext, though probably insufficient to establish pretext by itself."); see also Johnson v. Miami-Dade Cnty., 948 F.3d 1318, 1328 (11th Cir. 2020) (explaining that temporal proximity of less than two months was insufficient by itself to establish pretext). The relevant question is whether Rutledge has presented both evidence of temporal proximity and other evidence supporting her claim that Vengroff's stated reason for terminating her was pretextual. Daugherty v. Mikart, Inc., 205 F. App'x 826, 828 (11th Cir. 2006).

Here, the temporal proximity between the January 13 doctor's note and Rutledge's termination on March 3, 2020, does not establish pretext on her discrimination claim. See Weiher v. Lincare Procurement, Inc., No. 8:20-cv-2569-VMC-AEP, 2021 WL 4991528, at *10 (M.D. Fla. Oct. 27, 2021) (granting summary judgment for employer that terminated an employee nearly forty days after providing an accommodation due to the employee's extensive performance deficiencies that pre-dated her accommodation request), aff'd, No. 21-14157, 2023 WL 2250790 (11th Cir. Feb. 28, 2023). As an initial matter, Vengroff was aware that Rutledge had a knee problem that affected her ability to walk well before the January 13,

2020, doctor's note. Indeed, Vengroff set up a teleworking arrangement for Rutledge because of her knee issue back in July 2019. Thus, given that Rutledge had been given the accommodation of working from home because of her knee over seven months before she was terminated, temporal proximity between the January 2020 doctor's note and the March 2020 termination is not meaningful.

But even if the January 13 doctor's note was a significant event because it used the term "osteoarthritis" and mentioned the possibility of surgery, the temporal proximity between the note and the termination would not be compelling. This is because Rutledge has not presented other evidence that rebuts Vengroff's legitimate reasons head on – she has not shown that Vengroff's proffered reasons for her termination were false or that the true reasons were discriminatory, and she has not demonstrated such "weaknesses, implausibilities, incoherencies, or contradictions in [Vengroff's] proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." McCann, 526 F.3d at 1375; see also Pitts v. Hous. Auth. for City of Huntsville, 262 F. App'x 953, 956 (11th Cir. 2008) (upholding summary judgment for

employer where "none of the various reasons identified by Pitts as establishing pretext dispute, 'head on,' the [defendant's] reason for terminating him"); <u>Crawford v. City of Fairburn, Ga.</u>, 482 F.3d 1305, 1309 (11th Cir. 2007) ("[Plaintiff] erroneously argues that evidence of a discriminatory animus allows [her] to establish pretext without rebutting each of the proffered reasons of the employer.").

Again, it is undisputed that the last doctor's note Rutledge provided to Vengroff was from January 13, 2020. (Rutledge Depo. at Ex. 19). Vengroff had been requesting updates and medical documentation from Rutledge for months before she provided the January 13 note (Wagner Depo. at Ex. 1, Ex. 7; Rutledge Depo. at Ex. 22), supporting that Vengroff long desired to have medical documentation to justify the continued telework accommodation. Although the wording of the January 13 note was a bit confused, Vengroff reasonably interpreted the note's statement — "[t]his patient has been under my care and is able to return to work or school on for [sic] 3 weeks" — as meaning that Rutledge only had a medical directive to support her need for a teleworking accommodation until February 3, 2020. (Rutledge Depo. at Ex. 19; Wagner

Aff. at ¶ 6). And Vengroff's Telecommuting Policy provides
that an employee's failure to return to the office on the
expected date "will be considered a voluntary resignation."
(Rutledge Depo. at Ex. 8 at 59). While Vengroff did not give
Rutledge thirty days' written notice that she must return to
the office as stated in the Telecommuting Policy (Id.),
Wagner's emails to Rutledge in February made clear that
Rutledge was expected to return to the office by specific
dates unless she provided a doctor's note stating that she
needed to continue teleworking. See (Rutledge Depo. at Ex.
25) (email chain containing: a February 5 email from Wagner
asking Rutledge on February 5 if Rutledge was "able to get
the paperwork for [her] accommodations that [she was] still
needing and what [her] return to work date [would] be from
[her] visit on February 3rd?"; a February 17 email from Wagner
to Rutledge including "Going off the last paperwork
received[,] your 3 week period will end Friday. Your plans
are to return to work Monday on your normal schedule?";
additional February 17 emails from Wagner to Rutledge
stating, "I need to let [Pofahl] [k]now to expect your return
– from the note from the doctor that will be Monday, Correct?"
and explaining that "[i]f your time off needs to be extended,

34

please have the doctor complete a new note that includes a
new return to work date."; a February 21 email from Wagner to
Rutledge asking for a status update; and a February 24 email
from Wagner to Rutledge stating, "I was expecting you today,
but I do not see that you have signed in.").

Although Rutledge testified that she was never
explicitly told she would be fired if she failed to return to
the office by a specific date (Rutledge Depo. at 190:13-22),
this testimony does not rebut the evidence that Vengroff had
informed Rutledge that she was required to return to the
office unless she presented a doctor's note to justify a
continued telework accommodation. Thus, Rutledge has failed
to rebut that her failure to return to the office at
Vengroff's request after her medical directive to telework
had expired was one reason for her termination.

Nor is Rutledge's testimony about her perception of her
own work performance sufficient to rebut the evidence that
her supervisors at Vengroff believed she had performance
issues. Rutledge testified that she was a good team-player
and polite to all co-workers and clients. (Rutledge Depo. at
115:24-116:5, 125:12-126:6, 127:22-128:1, 164:1-7). However,
Rutledge does not dispute that at least some complaints about

her were made by co-workers. (Faure Depo. at 34:23-25; Doc.
# 28 at 4). As for customer complaints, at most, Rutledge
merely testified that she was not aware of any customer
complaints, "other than [her] talking fast." (Rutledge Depo.
at 157:11-20).

Rutledge has not rebutted that both of her former
supervisors, Cooper and Faure, believed that there were
issues with Rutledge's work and attitude. Indeed, Cooper and
Faure testified that clients and co-workers complained about
Rutledge and that Rutledge had attitude problems. (Cooper
Depo. at 48:6-10; Faure Depo. at 26:11-24, 32:18-21, 34:23-
25). Faure, who was supervisor from November 2019 through
Rutledge's termination, had given Rutledge a poor performance
review in December 2019, giving Rutledge a rating that fell
below "Progressing." (Faure Depo. at 56:17-23; Ex. 1). Faure
felt that Rutledge "was not improving" in her work. (Id. at
43:16-25).

"The inquiry into pretext centers on the employer's
beliefs, not the employee's beliefs and, to be blunt about
it, not on reality as it exists outside of the decision
maker's head." Alvarez v. Royal Atl. Devs., Inc., 610 F.3d
1253, 1266 (11th Cir. 2010). Here, Rutledge's personal belief

that she was a good employee is insufficient to rebut that
Rutledge's supervisors and decision-makers considered
Rutledge a difficult employee with performance issues. See
Weiher, 2021 WL 4991528, at *9 ("Weiher cannot survive summary
judgment simply by quibbling with whether her performance was
poor enough to merit termination or by relying on her own
speculation as to the true cause of her termination or the
breakdown of her working relationship with Fanning.").

True, Rutledge was not given written discipline or put
on a PIP before her termination despite Vengroff's
progressive discipline policy. (Faure Depo. at 42:6-17;
Cooper Depo. at 11:20-12:23; Pofahl Depo. at 17:16-18:16,
20:1-6; Wagner Depo. 14:4-22). Still, Vengroff's employee
handbook specified that Vengroff had "no obligation to use
any of the above disciplinary methods prior to discharging
employees." (Rutledge Depo. at Ex. 7 at 23 & Ex. 8 at 22).
Given Vengroff's reservation of the ability to terminate
employees without following a progressive discipline policy,
the failure to go through progressive discipline with
Rutledge does not create a genuine dispute as to pretext. See
Ritchie v. Indus. Steel, Inc., 426 F. App'x 867, 873 (11th
Cir. 2011) ("Other circuits have explained that, when an

37

employer has established a progressive discipline policy, a plaintiff may establish pretext by showing that the policy was not followed in his case. Nevertheless, if management has discretion as to whether to follow the discipline policy, then a failure to follow the policy does not show pretext." (citations omitted)). Thus, Rutledge has failed to rebut that performance issues were the second reason for her termination.

Finally, the fact that Vengroff has propounded two reasons for Rutledge's termination does not rebut the validity of either reason. There is no conflict between Rutledge's testimony that she was told her termination was due to performance issues, and Faure's testimony that she believed Rutledge was terminated based on the medical paperwork issue. Even though Faure believed the paperwork was the primary reason for the termination, Faure also testified at length about Rutledge's performance issues and the fact that Faure had informed Vengroff HR about Rutledge's performance issues a few days before the termination occurred. (Faure Depo. at 48:1–25). Furthermore, it is undisputed that Faure, Houston, and Pofahl made the decision to terminate Rutledge collectively. (Rutledge Depo. at 239:7–

11; Wagner Depo. at 93:20–21; Pofahl Depo. at 61:4–11). Pofahl testified that "dissatisfaction with her performance" was the reason for Rutledge's termination. (Pofahl Depo. at 49:24–50:3). Thus, while Rutledge may only have understood one reason for her termination, Rutledge has not rebutted that Vengroff had two legitimate reasons for her termination. See McCall v. Bright House Networks, LLC, No. 6:18-cv-1670-ACC-DCI, 2020 WL 70974, at *10 (M.D. Fla. Jan. 7, 2020) ("To be considered evidence of pretext, the reasons [for termination] should generally be inconsistent. The mere fact that an employer offers an additional reason for the employment decision does not suggest pretext if both reasons are consistent." (citation omitted)).

Because no genuine dispute of material fact exists as to pretext, summary judgment is also granted on the disparate treatment disability discrimination claims.

Accordingly, it is now

**ORDERED, ADJUDGED,** and **DECREED:**

(1) Defendant Vengroff Williams, Inc.'s Motion for Summary Judgment (Doc. # 25) is **GRANTED.**

(2)   The Clerk is directed to enter judgment in favor of Defendant Vengroff Williams, Inc. and against Plaintiff Andrea Rutledge on all counts of the complaint.

(3)   Thereafter, the Clerk is directed to terminate all pending deadlines and **CLOSE** the case.

   **DONE** and **ORDERED** in Chambers in Tampa, Florida, this 30th day of August, 2023.

                              VIRGINIA M. HERNANDEZ COVINGTON
                              UNITED STATES DISTRICT JUDGE